BARNES v. AMERICAN CHINA DEVELOPMENT CO. et al.

(Supreme Court, Appellate Division, First Department.    March 12, 1909.)

1. RELEASE (§ 58*)—QUESTIONS FOR JURY.

The construction of a written release is for the court.

[Ed. Note.—For other cases, see Release, Cent. Dig. § 109; Dec. Dig. § 58.*]

2. RELEASE (§ 31*)—CONSTRUCTION—GENERAL RELEASE.

Plaintiff, having rendered services for defendants in procuring a railway concession and a concession for mining coal in China, claimed compensation for procuring the coal concession as an independent demand, though this concession was procured in connection with the railway concession, and as a necessary part of defendants' railway enterprise. Defendants pleaded a release under seal, whereby plaintiff released them from all claims and demands "in connection with or arising out of the negotiation of any and all contracts and concessions for the construction of a railway in the Empire of China." *Held*, that the release was a general one, embracing plaintiff's claim for procuring the coal concession.

[Ed. Note.—For other cases, see Release, Cent. Dig. § 74; Dec. Dig. § 31.*]

3. RELEASE (§ 58*)—QUESTIONS FOR JURY.

Evidence relating to a general release under seal executed on a settlement of actions for procuring railway concessions considered, and *held* insufficient to warrant submitting to the jury the question of the intent of the parties with respect to the exclusion of a claim for procuring a coal concession from the operation of the instrument.

[Ed. Note.—For other cases, see Release, Cent. Dig. § 109; Dec. Dig. § 58.*]

4. EVIDENCE (§ 501*)—OPINION EVIDENCE.

One who testifies as to the value of his services in negotiating a contract for another should be required to state the facts on which his opinion is based.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2303; Dec. Dig. § 501.*]

McLaughlin and Houghton, JJ., dissenting.

Appeal from Trial Term, New York County.

Action by Thurlow W. Barnes against the American China Development Company and another. From a judgment for plaintiff, defendants appeal. Reversed.

Argued before PATTERSON, P. J., and LAUGHLIN, HOUGHTON, McLAUGHLIN, and SCOTT, JJ.

Charles F. Brown, for appellant China Development Co.

Arthur Van Brunt, for appellant Beaty.

Charles J. Hardy, for respondent.

PATTERSON, P. J. On careful consideration of the evidence as it appears in the record in this case, I think it is established that the plaintiff was employed to negotiate with the Chinese minister at Washington the contract which is referred to as the "coal concession," and that as a result of his efforts that contract (with others) was entered into, and that he would be entitled to recover the value of his service rendered in connection with that subject, were it not for the fact that

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

he has released his claim arising out of the performance of that service. That such release was operative to discharge that claim, now asserted in the present action, seems to me to be clear, especially when its terms are construed in connection with the surrounding circumstances in which it was executed, and the documentary evidence relating to it showing plainly the purpose of its execution and delivery. The construction of the release is for the court. It is a document under seal, and is an absolute relinquishment of all claims against the American China Development Company and the membership of voluntary associations known as the "'China Railways and Concessions Project" and the "Chinese Railway Syndicate," and against certain named persons, and releases and forever discharges such corporations, associations, and persons from any and all manner of action, actions, cause, and causes of action, etc., which the plaintiff ever had, or then had, "upon or by reason of any matter, cause, or thing whatsoever from the beginning of the world to the date of the date of these presents, in connection with or arising out of the negotiation of any and all contracts and concessions for the construction of a railway in the empire of China for the China Railways and Concessions Project, the American China Development Company, and the Chinese Railway Syndicate, and the various members thereof, and the various persons in any wise interested therein or either of them, which have been heretofore the subject of two certain actions pending in the Supreme Court of the state of New York, county of New York, the first between Thurlow Weed Barnes, plaintiff, and Calvin S. Brice and others, defendants, and the second between Thurlow Weed Barnes, plaintiff, and Frederick P. Olcott and others, defendants."

It becomes necessary to advert to facts appearing in this record relating to this release. As heretofore stated, it is shown that the plaintiff was employed to render certain services in the negotiation of contracts and the procurement of concessions for the construction of a railroad in China and certain other purposes in connection therewith, the detail of which need not be fully entered into. It may be assumed that sufficient is shown to impose liability upon these defendants for the value of such services, if any liability at all now exists. The starting point of the controversy between the parties in the aspect in which it is now presented may be considered as the time at which three several contracts or agreements were entered into between the Chinese minister to the United States of America and the American China Development Company, namely, the 14th of April, 1898. As the result of antecedent negotiations, on that day the three contracts were executed, and, as the plaintiff himself states, were in pursuance of an original plan or scheme of the persons interested in acquiring rights under such contracts or concessions. They are respectively, first, what is called the "Hankow-Canton contract," which undoubtedly was a concession for the construction and operation of a trunk railway line in China from the city of Hankow to the city of Canton, and thence to the sea, and in connection therewith certain provisions relating to the financing of the road were made; the second, or the so-called "Hankow-Peking," agreement, was not in itself a concession, but was a

provisional arrangement for the reversion to the American China Development Company of a grant which had already been made by the Chinese government to Belgian capitalists, and it was stipulated that, if the agreement or concession so made to the Belgians should be canceled, then the grant or concession should be given to the American China Development Company; the third, which is the subject-matter of this action, was an agreement, which is called a concession, relating to the right to mine coal on territory adjacent to the proposed line of railway. The recital or preamble in the last agreement referred to is as follows:

"Whereas, by an agreement entered into this day, the American China Development Company have agreed to provide a loan for the construction of a railway from the city of Hankow to the city of Canton, China; and whereas coal is one of the necessary articles to be used for working the said railway after its completion: Now, therefore, it is hereby resolved that, as soon as the said Chinese Railway Company shall have obtained concessions from the government to open and work coal on territory adjacent to the said railway, they will authorize the said American China Development Company and the said American China Development Company undertake to prospect, open, and work the said coal, the said American China Development Company undertaking to provide all the funds for the carrying out of this contract," etc.

While these contracts are separate in form, they all relate to the railway concession. They were negotiated and executed concurrently, and were all embraced within the original scheme of the parties associated in the railway enterprise. The coal contract or concession, so called, recites upon its face that it is made in connection with the agreement of the American China Development Company to provide a loan for the construction of the railway from the city of Hankow to the city of Canton, China, which is a provision contained in the railway concession, and further recites that coal is one of the necessary articles to be used for the working of the railway after its completion. This so-called coal concession is linked with the railway concession, and is an auxiliary contract, and not an entirely independent and separate contract or grant. Therefore, considering the terms of those two contracts, the circumstances in which and the purposes for which they were entered into, it seems plain that the release is a general release of all persons and corporations named therein from all causes of action, etc., in connection with or arising out of negotiations of all contracts and concessions for the construction of a railway in the empire of China by the Chinese Railway Company, etc. This coal concession was granted in connection with the contract for the construction of the railway, and, that being so, the release is general.

The plaintiff brought this action to recover for services rendered in connection with the procurement of these contracts or some of them, as well as other contracts alleged to have been negotiated and procured by him; but, upon the trial, the only question finally submitted was whether the plaintiff was entitled to recover for obtaining the so-called coal concession as an independent thing. Among the defenses set up in the answers was the general release, which was put in evidence. The plaintiff undertook to show that it was inoperative and ineffectual to discharge his claim for compensation for negotiating the coal contract,

and he claimed that it was not the intent of the parties in executing it to extinguish his claim for compensation for that particular service. I think this is to be regarded as a release general in its terms with no limitation by way of recital or otherwise, and that, to avoid it, it was necessary for the plaintiff to show mutual mistake or mistake on the part of one and fraud on the other, or fraud or duress; or, in other words, in seeking to avoid the defense of a general release under seal, it was necessary for the plaintiff to show such a state of facts as would have justified a court of equity in setting aside the instrument. Kirchner v. New Home Sewing Machine Co., 135 N. Y. 182, 31 N. E. 1104. The learned trial judge, however, sent the case to the jury upon an issue of intent of the parties in executing the document. Counsel for the defendants insisted throughout the whole trial that the construction and determination of the effect of the release was for the court, and excepted to its being left to the jury to determine what that effect was. The court held that there was a question of intent for the jury, and left it to them to determine what such intent was—with respect to the exclusion of the claim on the coal concession from the operation of the release. Of course, a question of intent is a question of fact, but, even if such a question did or could arise upon this record, the evidence is overwhelming that there was no intent of the parties to whom the release was given to exclude the coal contract from the operation of that release, whatever may have been the secret thought or purpose of the plaintiff alone.

It now becomes necessary to consider the evidence relating to this release. Its terms have been sufficiently stated. The first fact to be observed is that the release was given for the settlement and discontinuance of two actions which Mr. Barnes, the plaintiff, had brought against the American China Development Company and various persons interested in the China enterprise. One of those actions (called the Brice action) was to recover for the value of services rendered by the plaintiff in negotiating and procuring and holding the contracts, concessions, and agreements, specifically naming and claiming compensation for services in connection with the Hankow-Canton Railway contract and the Hankow-Peking agreement and the coal concession. It was for services rendered in connection with all those three contracts that the action was brought. There was another action, called the "Olcott" action, which it is not necessary to refer to fully, because from what appears in the complaint in the action against Brice and others it is apparent that compensation for procuring the so-called coal concession was one of the items of service for which a recovery was claimed. After the actions were at issue, overtures were made and negotiations had between the attorneys for the respective parties appearing therein for an adjustment and settlement of the matters involved in those actions, and from the correspondence between those attorneys it is evident that what was in contemplation of all parties was the adjustment and settlement of everything involved therein. On April 6, 1900, the attorney for the plaintiff wrote to the attorneys for some of the defendants a letter, in which it was stated that it was essential to Mr.

Barnes' plans to know whether the cases were to be settled or not.   He says:

"It is essential that we should know whether the matters involved in these litigations are to be settled by adjustment now, or whether we shall have to make our arrangements for other disposition of them."

And, further:

"I have seen Mr. Barnes since I last saw you.  I am in a position now where I can talk definitely on the question of a settlement, and I imagine it should require but very little time to bring us to a conclusion whether we settle or not."

Here was an invitation by the attorney for the plaintiff to the attorneys for the defendants to settle the matters involved in those litigations.   On April 19th the attorneys for the Chinese Syndicate offered to the attorney for the plaintiff the sum of $12,000 in settlement.   On April 20, 1900, the attorney for the plaintiff wrote the attorneys for the defendants that he had received their communication, stating a figure which they would be willing to pay "for an adjustment of the pending actions involving claims of my client, and declining the proposition of $12,000," and also stating, "I stand ready to do what I have, at your suggestion, said I would, viz., adjust the matters in difference upon a reasonable basis."   Again, on May 26, 1900, the plaintiff's attorney wrote to the defendants' attorneys that he expected to hear from them as to the suggestion that he had submitted upon terms which Mr. Barnes was willing to adjust the litigations.   On May 29, 1900, the plaintiff's attorney wrote to the defendants' attorneys as follows:

"Be good enough to let me know what will be required of Mr. Barnes, in the event of his accepting your suggestion as to settlement, and, when, if he accepts, the matter can be closed."

The defendants' attorneys, in answer thereto, stated:

"That if Mr. Barnes accepts Mr. Cary's suggestion, viz., a settlement in full on the basis of $15,000, we should expect a general release, a surrender of all documents indicating any interest in the affairs of the China Syndicate, together with consents that the above actions be discontinued without costs."

On June 5, 1900, forms of release and transfer, also orders of discontinuance of the actions, were sent by the defendants' attorneys to the plaintiff's attorney.

Now, it is perfectly clear that what was in the contemplation of the parties was the settlement of everything that was involved in the two actions that have been mentioned.   The sum of $15,000 was paid, and the attorney for the plaintiff wrote to the attorneys for the defendants and to the managing committee of the parties interested in the concessions under date of June 6, 1900, as follows:

"You are authorized hereby to give my attorneys, Messrs. Hardy & Shellabarger, check for the amount agreed upon in settlement of the above actions."

There would be no difficulty whatever in disposing of this question of intention from this correspondence.   Here is the overwhelming evidence that as matter of fact it was the intention of these parties to settle and quiet forever any claim of the plaintiff arising out of the matters embraced in these two actions, but on the day (June 8, 1900) the

release was actually executed the attorney for the plaintiff wrote to one of the attorneys for some of the defendants that Mr. Barnes was unwilling to execute a release which would cover any claim he may have against the members of the syndicate personally. "He thinks the arrangement made was for a release of all his claims growing out of negotiating the railway concessions." Thereupon there was inserted in the instrument a provision relating to the relinquishment and discharge of claims arising out of any cause or thing in connection with or arising out of the negotiation of any and all contracts or concessions for the construction of a railway in the empire of China, and for the China Railways and Concessions Project. In all this there was nothing whatever to apprise the defendants that there was a reservation of any claim embraced in the two actions. The only reservation that was intended to be made according to the last letter of the plaintiff's attorney was of personal claims against the members of the Chinese Railway Syndicate; and, in connection with that reservation of such personal claims, the statement is made that the arrangement is for the release of claims growing out of the railway concessions. All these concessions were for the railway. The only thing reserved was such personal claims as Mr. Barnes had (and he may have had them) against individuals in connection with this China enterprise.

This evidence cannot be so distorted as to make it appear that, when the defendants were settling and adjusting all the matters in controversy in these two actions, they intentionally reserved from the effect of that release, a claim which a jury has found amounts to nearly $400,000. In the suit against Brice and others, the plaintiff demanded nearly $1,000,000, and he settled all that was in dispute for the sum of $15,000. Even assuming that the plaintiff did retain a claim for compensation for procuring the coal concession, there is no such evidence in this record of the value of the service as would entitle the plaintiff to recover this enormous amount. There is no testimony or other evidence, except his own, on the subject of value, and on that subject he must necessarily have testified as an expert, and his examination indicates an attempt to qualify him to testify in that capacity. The effect of his testimony was to state an opinion, and the elements entering into the formation of that opinion are absolutely wanting. There is nothing but a guess. His compensation would be graduated by the value of the concession to his constituents. There is no evidence whatever of such value. All of the contracts seem to have been negotiated within two months' time by the plaintiff. The contract set forth in the action against Olcott and others furnishes no evidence of the value of the services of the plaintiff in procuring the coal concession.

The judgment should be reversed and a new trial ordered, with costs to the appellant to abide the event.

SCOTT, J., concurs.  LAUGHLIN, J., concurs on the ground that the cause of action was embraced in the release.

McLAUGHLIN, J. (dissenting). This action was brought to recover the value of services alleged to have been performed by the

plaintiff for the defendants in procuring for them certain contracts, concessions, or rights from the Chinese government; among others, one for mining coal.   The complaint charges, among other things:

"(4) That in or about the month of February, 1898, this plaintiff, at the special instance and request of the said association, China Railways and Concessions Project, undertook to obtain, on behalf of the said association and in the name of its said instrument, American China Development Company, concessions and grants of right from the imperial government of China, through its accredited representatives, for the obtaining of which the said association had been organized, and that thereafter this plaintiff so conducted himself in and about the said undertaking that by and through his sole and personal efforts, endeavors, and labors there were obtained certain concessions and grants of right of great value.

"(5) That among the concessions and grants of right so obtained by this plaintiff was one for the opening, working, and mining of extensive deposits of coal upon territory adjacent to the line of a proposed railway to run from the city of Hankow  *  *  *  to the city of Canton.  *  *  *

"(6) On information and belief plaintiff alleges that the reasonable value of the services by him rendered in securing said coal concessions is at least $750,000.  *  *  *"

"(10) That it was the understanding and agreement between this plaintiff and the said association and said American China Development Company that plaintiff should be paid reasonable and fair compensation for all work done. and all results achieved by him in the respects aforesaid.  *  *  *"

"(12) That as a part of and incident to the merger of the China Railways and Concessions Project, with its successor association assumed and agreed to pay all liability to this plaintiff for services rendered by him in the respects aforesaid, and that upon the continuance by the Chinese Railway Syndicate of the existence of the corporation American China Development Company, the said corporation American China Development Company assumed and agreed to pay all liability of the said syndicate to this plaintiff for services rendered in the respects aforesaid."

The answers of the respective defendants—and they are substantially identical—contains: First. A general denial of the material allegations of paragraphs 4, 5, 6, 10, and 12 of the complaint, excepting certain matters not relevant to this appeal.   Second. Allege that, if any services were rendered by the plaintiff in respect to the matters set forth in the complaint, such services were voluntary and gratuitous. Third. "(10) Defendant, for a further, distinct, and separate defense, reiterating the allegations of the earlier defenses so far as the same are applicable thereto, alleges, on information and belief, that the various contracts and concessions set forth in the complaint herein were not procured through the efforts of any one person, but were procured by the joint services and efforts of the different persons composing the association known as the 'China Railways and Concessions Project,' and other agents in China and in the United States during a period of two or more years prior to the granting of such concessions, and not through the sole services and efforts of plaintiff."   Fourth. A plea at bar, arising out of the prosecution of two former actions upon the same subject-matter and the settlement thereof by the payment to the plaintiff of the sum of $15,000.   Fifth. Payment to the plaintiff of $15,000 in full discharge and satisfaction of any and all claims arising out of the matters set forth in the complaint.   Sixth. A release under seal by plaintiff of the causes of action alleged in the complaint.

At the trial the plaintiff's right to a recovery was confined solely to

the question whether he obtained a concession to mine coal. He had a verdict for $391,666.66, and from the judgment entered thereon and an order denying a motion for a new trial each defendant appeals. They challenge the validity of the judgment principally upon the grounds (1) that plaintiff never obtained for the defendants' a concession to mine coal; (2) that they did not assume or agree to pay him a reasonable compensation for his services in obtaining a concession to mine coal; and (3) that the cause of action set out in the complaint was extinguished by the settlement of the two former actions referred to.

The consideration of these questions necessitates a review at some length of the facts involved, from which it appears that in 1895 there was formed an unincorporated association called the China Railways and Concessions Project (hereafter called the "Project") for the purpose of securing certain rights or concessions in China, and whatever rights were thus secured were to be taken in the name of the defendant American China Development Company, a New Jersey corporation, which was formed about this time or shortly thereafter. The Project was divided into 30 shares of $1,000 each, of which $27,000 was taken—the plaintiff being an original subscriber to the extent of one share—and it seems that he thereafter acquired 1½ shares additional. The money thus raised was expended without securing for the subscribers any substantial benefit, and in February, 1898, the plaintiff was requested by certain member of the Project to devote his time and services to the matter for the purpose of securing the concessions desired. Additional money was raised by subscription, and the plaintiff was requested to go to China, and, according to his own testimony, he was offered $25,000 a year and one-fourth of the profits which might be made if concessions were granted. He refused to go to China, but at his own suggestion was requested by the Project, or some of its members, to negotiate with his excellency, Wu Ting Fang, the Chinese minister at Washington, for the purpose of obtaining through him the desired concessions. He at once entered into active negotiations with the result that on April 14, 1898, three instruments were signed by the Chinese minister and the American China Development Company. By the first of these instruments the development company acquired the right to build a railroad from Hankow to Canton. The second, in the form of an addendum, provided for an extension of the railroad upon the same terms from Hankow to Pekin in case a contract with a Belgian syndicate for such a road should be canceled. The first agreement recited that whereas his imperial majesty, the Emporer of China, had deputed his excellency, Sheng Tajen, as director general of imperial Chinese Railways, South, to construct certain railways, and whereas a Chinese company had been formed, called the Chinese Railway Company, under imperial sanction, for the construction of railways, and whereas his excellency, Sheng Tajen, had designated his excellency, Wu Ting Fang, to enter into a contract for the purposes thereafter set forth with the American China Development Company, the agreement was made. It is unnecessary to state the terms of the agreement further than that the development company

was in form to advance the money for and construct the railroad for the Chinese company, and, as a guaranty of good faith that it would do so and carry out the terms of the agreement, it was to deposit $100,000 in a bank or trust company in the city of New York or Washington. Attached to the two agreements was a certificate to the effect that his excellency, Wu Ting Fang, had authority on the part of the Chinese government to execute the same. The third instrument, by reason or growing out of which it is claimed a concession to mine coal was obtained, recites that whereas the agreement as to the construction of the railroad just described had been made, and "whereas coal is one of the necessary articles to be used for working the said railway after its completion: Now, therefore, it is hereby resolved that as soon as the said Chinese Railway Company shall have obtained concessions from the government to open and work coal on territory adjacent to the said railway, they will authorize the said American China Development Company, and the said American China Development Company undertake, to prospect, open and work the said coal," providing the funds therefor, terms and details to be arranged with the director general of the Chinese railways. Immediately after the execution of these instruments, steps were taken by some of the active members of the Project to raise the $100,000 required to be deposited as a guaranty; and apparently for that purpose, and to meet other necessary expenses, another unincorporated association, called the Chinese Railway Syndicate (hereafter called the "Syndicate," one of the defendants), was formed, which was to take over the interests of the original unincorporated association—the Project. The shares in the Syndicate consisted of 50, of $5,000 each; members of the Project being allowed to subscribe proportionately for the shares in the Syndicate, and being credited with the amount of their original subscription, with interest. In this way the $100,000 was raised and deposited as required by the agreement, and stock of the corporation—the development company— the other defendant, which had theretofore been held by dummies was issued to members of the Syndicate in proportion to their respective holdings, and they were also given the right to subscribe proportionately for the balance of the stock of the company. The company then actively engaged in the prosecution of the enterprise. An engineer was sent to China to make preliminary survey of the proposed railroad and examination of the coal deposits along its line, and he thereafter made a full and complete report. The development company then commenced the construction of the railroad. How far it proceeded, or to what extent such construction was carried on, does not clearly or definitely appear from the record before us. It, however, does appear that the Chinese government, for some reason not disclosed, some time thereafter, canceled all the concessions which had been made. This resulted in negotiations being opened with the Chinese government for the purpose of having it pay to the development company the damages it sustained by reason of such cancellation. The negotiations finally culminated on the 29th of August, 1905, when an agreement was made between the Chinese government and the development company, by which the former was to pay to the latter as

"a reasonable indemnity for the cancellation of the said contracts" the sum of $6,750,000, and in consideration of which payment the Chinese government was to be entitled "to all property of the American China Development Company in China, railway constructed, materials, plans, mining concessions, and everything to which the American China Development Company has any right, direct or collateral, in China." The agreement contained other provisions which it is unnecessary to state; it being sufficient to say that the agreement was subsequently carried out.

The plaintiff, after having obtained the concessions or agreements executed by his excellency, Wu Ting Fang, on the 14th of April, 1898, claimed that he was entitled to compensation for the services rendered by him in securing them. He testified that, when the Syndicate was formed, the late Senator Brice, who was one of the leading members thereof, assured him that, in recognition of his services, the shares to which he was entitled to subscribe as a member of the project would be issued to him without additional payments by him, and for that reason he did not make any additional payments; that in October, 1898, he received notice that his opportunity to take such shares by reason of his failure to pay was withdrawn, and that his claim for services would not be recognized; that thereupon he commenced an action against the members of the Syndicate and the development company to recover the value thereof; that a few months later he brought a second action against the same parties, claiming that he had been wrongfully and unlawfully deprived, as a member of the Project, of an interest in the Syndicate, and demanding an accounting and settlement, and in June, 1900, these actions were discontinued by consent upon payment to the plaintiff of the sum of $15,000, in consideration of which he executed a release to the defendants for any and all claims "in connection with or arising out of the negotiations of any and all contracts and concessions for the construction of a railway in the Empire of China for the China Railways and Concessions Project, the American China Development Company, and the Chinese Railway Syndicate, and the various members thereof, * * * which have been heretofore the subject of two certain actions. * * * "

Shortly after the settlement of those actions, the plaintiff commenced the present one, by which he sought to recover $750,000 for his services in obtaining a coal concession, $100,000 for obtaining a banking concession, and $50,000 for services generally in advancing the interests of the defendants. The only question submitted to the jury was whether the plaintiff had obtained the coal concession; there being no proof of the other two claims. At the conclusion of plaintiff's case, the defendants moved to dismiss the complaint upon the ground, among others, that the cause of action alleged had not been proved. The motion was denied and an exception taken, and the defendants then rested without offering any evidence, and asked for the direction as a verdict in their favor. This was denied and an exception taken.

The first, and what seems to me to be the principal, question presented by the appeal, is whether the plaintiff did, in fact, procure for

the defendants from the Chinese government a concession to mine coal. It is clear that the agreement, which has been designated as the third one executed by his excellency, Wu Ting Fang, on the 14th of April, 1898, standing alone, gave to the defendants no such right, and the jury, at the request of defendants' counsel, was so instructed. That this was its ultimate purpose cannot be seriously questioned. The jury, as evidenced by their verdict, found that its purpose was accomplished, since the concession was obtained, and I am of the opinion there is sufficient evidence to sustain their finding in this respect. The answer of each defendant alleged that such concessions were not procured "through the sole services and efforts of plaintiff," but that the same "were procured by the joint services and efforts of the different persons composing the association known as the China Railways and Concessions Project. * * *" As a pleading, this allegation is not an admission that the plaintiff obtained for the defendants a concession to mine coal. When so considered, if the plaintiff avails himself of it, he must accept the allegation in its entirety. He cannot accept what makes in his favor, and reject what counts against him. Gildersleeve v. Landon, 73 N. Y. 609; De Waltoff v. Third Ave. R. R. Co., 75 App. Div. 351, 78 N. Y. Supp. 132; Shrady v. Shrady, 42 App. Div. 9, 58 N. Y. Supp. 546. The answers were in evidence (Holmes v. Jones, 121 N. Y. 461, 24 N. E. 701; Tisdale v. President, etc., D. & H. C. Co., 116 N. Y. 416, 22 N. E. 700; Field v. Surpless, 83 App. Div. 268, 82 N. Y. Supp. 127), and, when the allegation referred to is considered as evidence, the rule is different. Then a party is not estopped from questioning the portion of his adversary's pleading which is against him; on the contrary, he is at liberty to use the admission so far as it makes in his favor and disprove the balance. Mott v. Consumers' Ice Co., 73 N. Y. 543; Whitney v. Town of Ticonderoga, 53 Hun, 214, 6 N. Y. Supp. 844; affirmed 127 N. Y. 40, 27 N. E. 403. The answers alleged that a concession to mine coal was obtained, and, while this was not conclusive as against the general denial that the plaintiff obtained such concession, it could be considered with the other evidence in determining the truth of that allegation. Talbot v. Laubheim, 188 N. Y. 421, 81 N. E. 163. The answers of the defendants in the other two actions referred to were put in evidence, in each of which an admission was made that "on or about the 14th of April, 1898, three contracts were executed to" the American China Development Company, and "one of the contracts or concessions referred to relates to certain coal concessions and to the right to mine coal." In the papers submitted to the state department at Washington at a time when it was sought to have the United States government protect the concessions, the statement was made that one of them related to a concession to mine coal. In a prospectus issued by the Syndicate a statement was made that it had obtained "mining concessions." The resolution of the stockholders of the American China Development Company, ratifying and approving of the agreement between the company and the Chinese government, by which the latter was to pay to it $6,750,000 as an indemnity for cancellation of the concessions, included "mining concessions," as did the

agreement itself. The only mining concessions which the development company had in China, so far as appears, was the concession negotiated by the plaintiff on the 14th of April, 1898, and contained in the instrument called the "Coal Concession." The plaintiff testified that, after negotiating the three agreements referred to on the day last named, he made a report at a meeting of the members of the Syndicate, which was in writing, and in which he stated that "Coal Mining Concession is separate"; that he turned over the original agreements to the Syndicate and took its treasurer's receipt therefor, and one of the agreements thus delivered and specifically mentioned in the receipt was: "(3) Coal Concession. Original." When the plaintiff's testimony is considered in connection with the other evidence, including the admission in the answers, I think a prima facie case was made, which justified the jury in finding that the defendants not only obtained a concession to mine coal, but that the same was obtained solely through the efforts of the plaintiff.

It is strenuously urged by defendants' counsel that the plaintiff failed to prove a valid concession to mine coal. This, however, does not seem to me to be important. He obtained what the defendants and the Chinese government considered a valid concession; otherwise it would not have been mentioned in the release given to the Chinese government, and for which it, in part at least, paid such a large sum by way of indemnity for cancellation. If I am correct in the conclusion that the jury was justified in finding that the defendants, through the efforts of the plaintiff, obtained the coal concession, then it necessarily follows that he was entitled to recover, unless his cause of action was extinguished by the settlement of the two prior actions, and the receipt and release which he then gave. The complaint in the prior action for services included the claim made in this action, and, had that action been prosecuted to and resulted in a judgment, it would undoubtedly have extinguished the present claim. But that action was not prosecuted to judgment. It was discontinued by consent, the defendants paying to the plaintiff $15,000 for certain things specified, which, according to the receipt given by the plaintiff, was "for all services in connection with the negotiation of any and all contracts and concessions for the construction of a railway in the empire of China for the China Railways and Concessions Project and the American China Development Company and all claims against the Chinese Railway Syndicate or the various members thereof in connection therewith." The release given by him was from all claims "in connection with or arising out of the negotiation of any and all contracts and concessions for the construction of a railway in the empire of China for the China Railways and Concessions Project, the American China Development Company, and the Chinese Railway Syndicate and the various members thereof, * * * which have been heretofore the subject of two certain actions." Upon the face of the receipt and release, the court could not hold as matter of law that the claim here made was included, and especially so when such instruments are read in connection with the correspondence between the attorneys for the respective parties, which finally culminated in the set-

tlement and the execution of those papers. From this correspondence it appears that the portion of the release quoted, and the words "in connection therewith" in the receipt, were added at plaintiff's request, which would seem to indicate that it was his intention to limit the settlement of those actions to his claim for obtaining the railroad concession, and reserve for further consideration his claim for obtaining the coal concession. The receipt was not made conclusive, nor was the release. Both were open for explanation. "The rule respecting the construction of releases is that, although taken most strongly against the releasor, yet general words are to be construed by their context, and, if there appears a clear intent to make a limitation or exception, it shall be allowed." Slayton v. Hemken, 91 Hun, 582, 36 N. Y. Supp. 249; Murphy v. City of New York, 190 N. Y. 413, 83 N. E. 39. What the parties intended by the receipt and release was a question of fact. It was for the jury, and not for the court. E. S. T. F. Co. v. Grant, 114 N. Y. 40, 21 N. E. 49. This question, therefore, was properly submitted to the jury, and its finding in plaintiff's favor cannot be disturbed.

It is also urged that the recovery cannot be sustained for the reason that whatever services were rendered were in accordance with the promise of Senator Brice on behalf of the Project before the Syndicate was formed; that the plaintiff having, as he claimed, an express contract, it was error to permit him to testify as to the value of his services; that the alleged contract could not be enforced against the Project, since it had not entered into it; that the plaintiff, being a member of the Project, could not maintain an action against it for services rendered by him, and that the liability of the members of the Project was limited to their subscriptions, and neither the development company nor the Syndicate ever agreed to pay the plaintiff; the Syndicate having expressly disclaimed any liability. The argument of the appellant's counsel in this respect is very ingenious, but it does not appear to be sound. It is unnecessary to determine whether plaintiff had a contract which he could enforce against the members of the Project. That he did, in fact, render valuable services cannot be seriously disputed, and the Syndicate and development company received the benefit of such services. The concessions which were obtained were taken in the name of the development company, of which the plaintiff was never a stockholder. Neither was he ever a member of the Syndicate. They knew what he was doing and whatever was accomplished was for their benefit. There was an implied agreement on their part to pay him what his services were reasonably worth. Where one renders valuable services for another, with his consent, the law implies, even though nothing is said as to compensation, that he shall receive what the services are reasonably worth. This obligation the defendants recognized when they paid $15,000 for the release for the railroad concession, which fact the jury had a right to consider in connection with the question whether the defendants ever agreed to pay the plaintiff for his services in obtaining the coal concession.

Under the facts proved, I think the plaintiff was entitled to maintain the action against the company and the Syndicate upon a quantum

meruit, and it does not matter what his relations with the Project were. After a careful consideration of the record, I am of the opinion that the plaintiff made out a prima facie case entitling him to recover, and the evidence is sufficient to support the verdict. The defendants offered no evidence. They were content to rely upon what they considered the weakness of plaintiff's case rather than upon any defense which they might have had to the cause of action alleged.

Certain errors are alleged as to the admission of evidence and instructions given to the jury, but the conclusion thus reached renders it unnecessary to here consider them; it being sufficient to say that they would not justify a reversal of the judgment.

I am of the opinion that the judgment and order appealed from should be affirmed.

HOUGHTON, J. (concurring). I concur in the conclusion reached by Mr. Justice McLAUGHLIN and in the reasons advanced by him for affirming this judgment.

It is not an answer to plaintiff's claim to say that he did not obtain from the Chinese Government an unassailable and absolutely valid concession to mine coal. Whatever the concession was, it was good enough for the defendants to adopt and call valid and turn back to the Chinese government as part consideration for the $6,000,000 which that government paid because of its cancellation. Being valid enough to use in this way, it was good enough to pay plaintiff for getting. The record discloses that the profit to defendants in the transaction was upwards of $4,000,000. If plaintiff's contract with defendants be deemed specific and to have been $25,000 per year and one-fourth of the profits, he has recovered on quantum meruit less than one-fourth of the profits, and hence less than the sum prescribed by his contract. The defendants having refused to pay the alleged agreed price, the plaintiff had the right to waive the stipulated compensation, and sue for the value of the services actually performed by him. The amount which he has recovered does not exceed the stipulated price, and therefore the rule that on quantum meruit no more than the agreed price can be obtained has not been violated. Although the price for services has been agreed upon, the person rendering them is not compelled to sue on such special contract, but may bring an action on quantum meruit, and recover to the extent of the agreed price. Fells v. Vestvali, *41 N. Y. 152; Boyd v. Vale, 84 App. Div. 414, 82 N. Y. Supp. 932. If the value which plaintiff (the only witness on the subject) put upon his services exceeded the stipulated price, the defendants should have introduced testimony showing that fact. They knew accurately the amount of profits, and plaintiff did not. The defendants could have proved, if such was the fact, that the profits were small, and that plaintiff's proven value exceeded the stipulated price. Having failed to make any such proof, the presumption is that the amount recovered by the plaintiff is not in excess of the $25,000 per year and one-fourth of the profits realized through the scheme.

The plaintiff was qualified to prove the value of his own services. A person who has rendered services for another is competent to give

his opinion of their value, for he knows their precise nature, and must have some knowledge of what they are worth.   Mercer v. Vose, 67 N. Y. 56.   Such an opinion is not controlling upon a jury, and may not have much weight with them.   It is competent evidence, however. Plaintiff's opinion was the only one on the subject, and he was competent to give it.   The services were unique in character, and were not rendered concerning an ordinary matter.   While the plaintiff put a large value on them, and while the jury rendered a verdict large in amount, although not so great as the plaintiff testified his services were worth, this court cannot disturb such verdict on the ground that it is against the weight of evidence, because there is no weight on the part of the defendants, for they introduced no evidence at all on that subject.   The services were not of such a character that this court can take judicial notice of their value as it might in some instances.   If the defendants were not content with the value put by the plaintiff, they could have called experts upon the subject.   They not having done so, the presumption is that, if the plaintiff is entitled to recover at all, the value which he placed upon his services was one with which the defendants upon the trial were content, and it is too late for them now to complain in that regard.

Nor is the plaintiff barred from maintaining this action because of the release which he gave to the defendants.   There is no mystery about a release under seal.   If it is general and absolute, it is binding upon the releasor as any other written instrument would be.   If he seeks to be relieved from its effect, he can avoid it only because it was procured by fraud or duress, or executed under a mutual mistake or mistake on one side and fraud on the other, or because there was no consideration.   But there is another rule with respect to releases equally as binding upon the parties thereto, and as universally applied, and that is that the whole instrument must be considered in construing its scope and meaning, and that broad and general terms are controlled and limited in their effect by limitations contained in the recital or any part of the instrument.   This court in Romaine v. Sweet, 57 App. Div. 613, 68 N. Y. Supp. 516, through Mr. Justice Rumsey, concisely stated the true rule as follows:

"It is the settled rule that, where there is a general release followed by a particular recital, the paper will be construed to apply solely to the particular matter."

This rule of interpretation was deduced from the early cases of Jackson v. Stackhouse, 1 Cow. 122, 13 Am. Dec. 514, and McIntyre v. Williamson, 1 Edw. Ch. 34, and kindred cases.   Mr. Justice Patterson in Slayton v. Hemken, 91 Hun, 582, 36 N. Y. Supp. 249, in discussing the subject, says:

"The rule respecting the construction of releases is that, although taken most strongly against the releasor, yet general words are to be construed by their context, and, if there appear a clear intent to make a limitation or exception, it shall be allowed.   Therefore recitals are said to control the general clause and make it special, and so the particular subject of the dealing out of which the release arises may, if distinctly stated in the instrument before the general clause, confine the effect of that general clause to matters directly connected with that particular subject.   But it is all a matter of intention."

This same rule is recognized and commented upon with approval in Kirchner v. N. H. S. M. Co., 135 N. Y. 182, 31 N. E. 1104, and the reason the release in that case was held binding was that it was general in its terms and contained no exception. In Slayton v. Hemken, supra, the release was general in its terms, and concluded with the words, "and particularly from all claims and demands" arising out of a partnership relation of the parties.

The release in the present case is general in terms, and releases the defendants from all claims and demands "in connection with or arising out of the negotiations of any and all contracts and concessions for the construction of a railway in the empire of China." The language of the release is specific that it shall operate only as an absolute release of all claims and demands of the plaintiff concerning a particular thing. The release is not so broad as it would have been had it released the defendants from all claims and demands, and "particularly" concerning a special matter. The fair and only proper reading of its language is that plaintiff releases the defendants from all claims and demands of whatever nature he may have concerning the particular thing specified, which is the obtaining of railway concessions in China. If the plaintiff had performed any other services for the defendants, the release would not have covered them. If he had held a mortgage against the defendants, it would be absurd to say that the general release covered the mortgage, or, if he held a note, that the note was discharged because of the release. The release is general only with respect to the particular thing which it enumerates, to wit, the obtaining of railway concessions in China. The only matter left for consideration, therefore, is whether the obtaining of the concession to mine coal can be said to be fairly embraced and included in the concession to build a railway. I think it cannot. It is true that the concession to build a railway would have been useless if the defendants had not found and obtained the right to mine coal. Motive power was necessary. So were rails and ties and locomotives and cars. If the plaintiff at the request of the defendants had purchased a tract of timber or a quantity of rails, although they would have been connected with the railway, they could not be said to have been a part of the railway concession, nor would his claim for services therefor have been destroyed by the release.

It was proper to prove the circumstances under which the release was executed, and they show conclusively to my mind that it was not intended that the release should embrace the obtaining of the coal concession. The plaintiff refused to sign the release as drawn by the defendants' attorneys, and the letter from his attorney states that the plaintiff understood that the release was to cover only his services for negotiating the railway concession. It was at the plaintiff's suggestion and insistence that the words, "in connection with the negotiation of any and all contracts and concessions for the construction of a railway," were added to the release. The plaintiff's entire conduct shows that he at least understood that he was not releasing his claim for services in obtaining the coal concession. If the defendants supposed he was and paid him the $15,000 on that supposition, it is for them to have the release reformed so as to embrace all the claims and demands of

whatever nature the plaintiff had against them. If the release did not embrace the coal concession, then it did no harm to submit the question as to whether it did embrace it or not to the jury. If the extrinsic evidence raised any question concerning it, then it was entirely proper that that question should be submitted to the jury.

The plaintiff has obtained a judgment large in amount, it is true, but I think there were no errors upon the trial calling for a reversal, and I therefore vote for an affirmance.